UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
:
GIOVANNI JOSE MARTINO MORENO,                    :       <u>DECISION AND ORDER</u>
                                                 :       13-cv-1285 (WFK) (SMG)
                    Petitioner,                  :
                                                 :
        -against-                                :
                                                 :
ERIC H. HOLDER, JR.,                             :
                                                 :
                    Respondent.                  :
                                                 :
-----------------------------------------------------------X
**WILLIAM F. KUNTZ, II, United States District Judge**

Giovanni Martino Moreno ("Petitioner"), acting *pro se*, asserts a claim of nationality based on derivative citizenship. For the reasons that follow, the Court hereby DENIES Petitioner's nationality claim.

**I.   Preliminary Statement**

This action originated on August 15, 2012, when Petitioner filed a motion for a stay of removal with the Second Circuit Court of Appeals, asserting "Petitioner could be possible [sic] a derivative citizen of the United States." Dkt. No. 1, Att. 3 (Petition for Review and Stay of Removal, dated Aug. 15, 2012) and Att. 4 (Motion Information Statement, dated Sept. 5, 2012). Finding genuine issues of material fact regarding Petitioner's nationality claim, the Second Circuit transferred the case to this Court, pursuant to 8 U.S.C. § 1252(b)(5)(B), for resolution of Petitioner's claim. *Id.*, Att. 6 (Second Circuit Order, dated Feb. 25, 2013). On June 13, 2013, this Court conducted an evidentiary hearing where it reviewed *de novo* Petitioner's claim of derivative citizenship. Petitioner, proceeding *pro se*, appeared at the hearing with his mother,

1

Ms. Eduviges Concepcion Moreno ("Eduviges"), and his father, Mr. Mario Jose Martino ("Mario"). The Government opposed Petitioner's motion, arguing, pursuant to 8 U.S.C. § 1432(a), that Petitioner did not derive citizenship through the naturalization of either or both of his parents. After careful review of the evidence submitted and elicited at the hearing, the Court finds Petitioner failed to demonstrate by a preponderance of the evidence that he derived citizenship from his naturalized parents.

## II. Factual Background

Petitioner was born in Panama in 1975 to Mario and Eduviges, both citizens of Panama. *See* Gov't Ex. L (Appl. for Immigrant Visa); Gov't Ex. C (Dep. Tr. of Mario Jose Martino ("Mario Dep. Tr.")) at 7:10–9:19. Although unmarried at the time of Petitioner's birth, Mario and Eduviges later married on December 27, 1979 in Panama, *see* Gov't Ex. B (Marriage Certificate), and Mario's paternity is not disputed, *see* Govt' Ex. L (Appl. for Immigrant Visa listing Mario as Petitioner's father); Mario Dep. Tr. at 6:12–19; Hr'g Tr. at 47:15–17 ("Even though you married Eduviges after Giovanni was born, did you always acknowledge him as your son? A: Yes. I gave him my name when he was born."). When they married, Mario was enlisted in the United States Army, stationed in Panama. Mario Dep. Tr. at 10:2–11:6, 14:22–15:10.

Mario became a United States citizen on April 11, 1979, when Petitioner was four years old. Gov't Ex. O (Mario Cert. of Naturalization). In 1980, Mario was transferred to an army base in California. Mario Dep. Tr. at 11:3–11. On March 26, 1980, the United States Embassy in Panama granted Petitioner's Application for Immigrant Visa. *See* Gov't Exs. L, S. Two months later, Petitioner and Eduviges entered the United States to join Mario in California. Gov't Ex. M; Gov't Ex. R; Gov't Ex. N (Dep. Tr. of Eduviges Martino ("Eduviges Dep. Tr.")) at

2

8:18–22. The family returned to Panama in 1982 or 1983, where they remained until 1984 or 1985, when the army discharged Mario and the family moved to New York. Mario Dep. Tr. at 11:22–12:19, 15:19–16:4. The family has resided in New York continuously since that time. *Id.* at 6:2–25. Eduviges became a United States citizen on August 5, 2008, when Petitioner was thirty-three years old. Gov't Ex. A (Eduviges Cert. of Naturalization).

Although Mario and Eduviges remain married, they periodically separated over the course of their marriage. *See, e.g.*, Mario Dep. Tr. at 16:17–24, 23:9–29:3, 34:18–38:10. Mario estimates he and Eduviges separated between three and nine times over the course of their marriage, sometimes for as long as one-and-a-half or two years. *See id.* at 23:25–24:9, 27:5–11. The couple never had a legal separation, nor did they ever seriously consider divorce. *Id.* at 36:24–38:10; *see also* Hr'g Tr. at 57:1–16 ("Q: Thank you. Did you ever speak to an attorney about getting a legal separation? A: Never. Q: Did you ever consider getting a legal separation in Panama? A: Never. I love my wife. Q: Did you ever consider getting a legal separation in California? A: Never. Q: And also in New York, never? A: Never. Q: Okay. Did you know that it was possible to obtain a legal separation? A: I did not want no legal separation. I was looking forward to make up and she coming back."); Hr'g Tr. at 64:18–24. Mario and Eduviges currently live together as husband and wife. Mario Dep. Tr. at 16:17–24; *see also* Eduviges Dep. Tr. at 8:3–4.

### III. Procedural Background

On March 29, 2004, following convictions for attempted petit larceny and attempted robbery in the second degree, the Government initiated removal proceedings against Petitioner for his convictions for "two crimes involving moral turpitude not arising out of a single scheme or criminal misconduct." Gov't Ex. E at 1, 3 (Notice to Appear at Removal Proceedings, dated

3

Mar. 29, 2004) (citing 8 U.S.C. § 1227(a)(2)(A)(ii)). On September 27, 2004, Petitioner applied for, and was granted, cancellation of the removal proceedings. Gov't Ex. Q (Immigration Court Removal Proceedings, dated Sept. 27, 2004).

The Government initiated removal proceedings against Petitioner for the second time on February 23, 2010. Gov't Ex. G (Notice to Appear at Removal Proceedings, dated Feb. 23, 2010). On March 16, 2011, Petitioner was charged with removability for having been convicted in 2005 of criminal possession of a controlled substance (crack cocaine) in the seventh degree. *See id.* (citing 8 U.S.C. § 1227(a)(2)(B)(i)); *see also* Gov't Ex. H (Immigration Court Removal Proceedings, dated Mar. 16, 2011); Gov't Ex. I (Decision of the Board of Immigration Appeals, dated Jul. 28, 2011). The Board of Immigration Appeals ("BOA") entered a final administrative order of removal in respondent's case on July 28, 2011. Gov't Ex. I; *see also* Gov't Ex. J (Decision of the BOA, dated Aug. 8, 2012).

On June 27, 2012, Petitioner filed a motion to reopen or reconsider the BOA's final order, raising a claim of ineffective assistance of counsel. *See* Gov't Ex. J. The BOA denied Petitioner's motion on August 8, 2012, affirming its final order of removal because Petitioner's motion was untimely filed and Petitioner was not entitled to equitable tolling because he failed to notify his former counsel of the claim; and, in any event, ineffective assistance was not facially apparent in the case. *Id.*

On August 17, 2012, Petitioner filed a Petition for Review and Stay of Removal with the Second Circuit Court of Appeals. *See* Dkt. No. 1, Att. 3; *see also* 2d Cir. Dkt. No. 12-3394, No. 3. Petitioner filed a second motion to stay removal on September 10, 2012, in which motion Petitioner first asserted the possibility of derivative citizenship. *See* Dkt. No. 1, Att. 4; *see also* 2d Cir. Dkt. No. 12-3394, No.18. In response to the Government's second motion in opposition,

*see* 2d Cir. Dkt. No. 12-3394, No. 21 ("Martino Moreno fails to substantiate in any way his newly raised assertion that he may be a derivative United States citizen"), Petitioner filed a response stating he "'has a legitimate claim of derivative citizenship' based on a theory that he derived citizenship as a child through his father," Gov't Br. at 2 (citing 2d Cir. Dkt. No. 12-3394, No. 32 at 5–6). On February 25, 2013, following Petitioner's assertions and pursuant to 8 U.S.C. § 1252(b)(5)(B), the Second Circuit ordered this Court to conduct a *de novo* evidentiary hearing to determine whether Petitioner derived United States citizenship. Dkt. No. 1, Att. 2; *see also* 2d Cir. Dkt. No. 12-3394, Nos. 54, 55.

## IV. Discussion

### A. Standard of Law

Pursuant to 8 U.S.C. § 1252(b)(5)(B), "[i]f the petitioner claims to be a national of the United States and the court of appeals finds that a genuine issue of material fact about the petitioner's nationality is presented, the court shall transfer the proceeding to the district court of the United States for the judicial district in which the petitioner resides for a new hearing on the nationality claim and a decision on that claim as if an action had been brought in the district court under section 2201 of Title 28." Once transferred, this Court must conduct a *de novo* evidentiary hearing to determine the validity of the petitioner's claim of citizenship. *Fisher v. Mukasey*, 274 Fed. App'x 96, 98 (2d Cir. 2008) (citing *Agosto v. Immigration and Naturalization Serv.*, 436 U.S. 748, 756–57 (1978)). The petitioner bears the burden of proving citizenship by a preponderance of the evidence. *Fisher v. Mukasey*, No. 08-CV-1812, 2008 WL 4693135, at *6 (E.D.N.Y. Oct. 22, 2008) (Bianco, J.); *Berenyi v. Dist. Director, INS*, 385 U.S. 630, 637 (1967) ("[T]he burden is on the alien applicant to show his eligibility for citizenship in every respect. This Court has often stated that doubts should be resolved in favor of the United States and

5

against the claimant.") (internal quotation marks omitted); *cf.* 22 C.F.R. § 51.40 ("The applicant has the burden of proving that he . . . is a U.S. citizen or non-citizen national.").

Pursuant to 8 U.S.C. § 1432, an individual born abroad, to alien parents, who reached age eighteen before the enactment of the Child Citizenship Act of 2000 on February 27, 2001,[1] may derive United States citizenship through the naturalization of a parent or parents where the following conditions have been met:

> (1) The naturalization of both parents; or
> (2) The naturalization of the surviving parent if one of the parents is deceased; or
> (3) The naturalization of the parent having legal custody of the child when there has been a legal separation of the parents or the naturalization of the mother if the child was born out of wedlock and the paternity of the child has not been established by legitimation; and if
> (4) Such naturalization takes place while such child is under the age of eighteen years; and
> (5) Such child is residing in the United States pursuant to a lawful admission for permanent residence at the time of the naturalization of the parent last naturalized under clause (1) of this subsection, or the parent naturalized under clause (2) or (3) of this subsection, or thereafter begins to reside permanently in the United States while under the age of eighteen years.

8 U.S.C. § 1432(a), *repealed by* Child Citizenship Act of 2000, Pub. L. 106-395, 114 Stat. 1632.

**B. Petitioner is Not a Derivative Citizen**

It is undisputed that both of Petitioner's parents are living and that only one, Mario, naturalized before Petitioner's eighteenth birthday. *See* Gov't Ex. A (Eduviges Cert. of Naturalization, dated Aug. 5, 2008). Accordingly, neither subsection (1) nor subsection (2)

---

[1] Congress enacted the Child Citizenship Act of 2000 to "streamline automatic citizenship for children born abroad . . . at least one of whose parents subsequently naturalized as a United States citizen." *In re Rodriguez-Tejedor*, 23 I. & N. Dec. 153, 156–57 (BIA 2001) (quoting H.R. Rep. No. 106-852, at 4 (2000)) (internal quotation marks omitted). The Act repealed 8 U.S.C. § 1432 and replaced 8 U.S.C. § 1431 with "a more generous provision." *Id.* at 156. The revised provisions do not apply to Petitioner because he was over the age of eighteen when the Act took effect. *Id.* at 163 ("[I]f an individual . . . is over 18 years of age during the validity of the statute now in effect [which entered into effect on February 27, 2001], he cannot meet the material conditions for automatic citizenship.").

6

applies to support Petitioner's claim. *See* 8 U.S.C. §§ 1432(a)(1), (2). Pursuant to subsection (3), an individual may derive citizenship in one of two ways: either through (a) the naturalization of the custodial parent when there has been a legal separation of the parents, or (b) the naturalization of the mother if the child was born out of wedlock and the paternity of the child has not been established by legitimation. Mario's paternity is also undisputed. *See* Gov't Br. at 3, n.4; *see also* Govt' Ex. L (Appl. for Immigrant Visa listing Mario as Petitioner's father); Mario Dep. Tr. at 6:12–19; Hr'g Tr. at 47:15–17. Accordingly, the only avenue by which Petitioner could possibly claim derivative citizenship would be through "the naturalization of the parent having legal custody of the child when there has been a legal separation of the parents." 8 U.S.C. § 1432(a)(3).

"[T]he meaning of the term 'legal separation' within § 1432(a)(3) is a question of federal law." *Brissett v. Ashcroft*, 363 F.3d 130, 133 (2d Cir. 2004). In *Brissett v. Ashcroft*, the Second Circuit held that "§ 1432(a)(3)'s requirement of a 'legal separation' is satisfied only by a formal act which, under the laws of the state or nation having jurisdiction of the marriage, alters the marital relationship either by terminating the marriage (as by divorce), or by mandating or recognizing the separate existence of the marital parties." *Id.* at 132. In concluding that "an informal separation is not sufficient to render the parties legally separated," *id.* at 133, the Court relied on both the text of the statute and sound policy considerations:

> [To] includ[e] an informal separation within the provision's terms would effectively eviscerate the force of the term 'legal' from the statute. Moreover, such a broad definition would render any number of couples, voluntarily apart for any reason, legally separated, and the resulting automatic naturalization of the couples' children upon the naturalization of the couples' children upon the naturalization of one spouse could have unforeseen and undesirable implications for many families.

*Id.* at 134 (internal citation omitted).

7

The record before the Court does not enable the Court to determine conclusively which state or nation had jurisdiction over Mario and Eduviges' marriage through 1993—the year Petitioner turned eighteen. Nor does the Government adequately brief this choice-of-law determination. *See, e.g.*, Gov't Br. at 8 ("Mario and Eduviges were married in Panama, and were subject to the jurisdiction of Panama law until they moved to New York in 1984 or 1985."); *see also* Hr'g Tr. at 25:22–27:7. Because Mario and Eduviges were married in Panama in 1979 and became domiciled in New York in 1984 or 1985, either Panama or New York must have had jurisdiction over their marriage for this entire period.[2] However, the Court need not determine which had jurisdiction over Eduviges and Mario's marriage at any given moment during this time period because Eduviges and Mario did not obtain a "legal separation" under either Panama or New York law.

Under Panama family law, physical separation alone does not constitute legal separation. *See* Gov't Br., Addendum B (Panama Civil Code (1973) Art. 125, 127), Addendum A (Panama Family Code (1994) Art. 201), and Addendum C (Univ. of Panama Sch. of Law and Political Sci., *A Statement of the Laws of Panama in Matters Affecting Business* 257 (1978)). To obtain a legal separation under Panama law, a spouse must obtain a judicial separation decree by demonstrating one or more recognized grounds for separation, such as adultery, cruel treatment, or total abandonment. *See* Addendum B, Arts. 114, 126, 127. A marriage governed by Panama law is legally suspended by separation duly ordered by competent legal authority. *Id.*, Art. 127. Neither Eduviges nor Mario intended or attempted to seek a separation decree, nor did either obtain a separation decree in fact. *See, e.g.*, Hr'g Tr. at 56:15–19 ("Q: Okay. Did you ever

---

[2] The Government notes that Mario retained Panamanian domicile during the time he was stationed in California in the early 1980s. Gov't Br. at 8, n.9 (citing *Furman v. Gen. Dynamics Corp.*, 377 F. Supp. 37, 45 (S.D.N.Y. 1974) ("[M]ilitary service in no way affects a person's domicile or permanent residence, in the absence of acts showing an intent to change it.")).

8

obtain a legal separation order in anywhere you lived? A: No, no. We never went to no lawyer or nothing. We never did nothing legal. It was just the way we fight, we separate and we got back together.") Therefore, there was no legal alteration of their marriage under Panamanian law.

Similarly, under the New York Domestic Relations Law, a married couple may file a legal action for separation for any one or more of several reasons, including adultery and abandonment. N.Y. Domestic Relations Law § 200. Alternatively, New York law also recognizes a legal separation where the parties enter into a written separation agreement. *See id.* § 170(6) (permitting divorce through provision of "a written agreement of separation, subscribed by the parties thereto and acknowledged or proved in the form required to entitle a deed to be recorded," among other conditions); *see also Schine v. Schine*, 31 N.Y.2d 113, 116, 335 N.Y.S.2d 58, 60, 286 N.E.2d 449, 450 (N.Y. 1972). Neither Mario nor Eduviges sought a separation decree or entered into a written separation agreement. *See* Mario Dep. Tr. at 24:15–22 ("Q: But you never divorced? A: Never. Why? I love her. Q: Did you ever have a legal separation? A: I never knew anybody that separated and got a legal separation unless you are not going to be together, unless you divorce."); *id.* at 37:18–21 ("Q: So you never filed for a legal separation? A: No, I never field for a legal separation."); *see also* Eduviges Dep. Tr. at 25 ("Ms. Dawgert: And did you ever consider getting a legal separation from your husband? The Witness: No."); Hr'g Tr. at 56:15–19. According to Mario, their separations were always informal, albeit somewhat frequent, events. *See id.* at 23:11–19 ("I like the street so every time we got a fight, she goes, and sometimes I am not with her for a year, then we get back together, go 'Sweetheart,' get her some roses, then we get back together and we separate again because I have been messing with another woman. I did this all my life. Lately, though, we are back

together."). Under New York law, such informal agreements do not establish "legal separation" sufficient to establish derivative citizenship. *Brissett*, 363 F.3d at 132.

Accordingly, there is no evidence in the record from which the Court could reasonably conclude that Petitioner's parents entered into a legal separation. Therefore, Petitioner did not derive citizenship through his father under 8 U.S.C. § 1432(3).

## V. Conclusion

Absent any statutory basis for concluding that Petitioner is entitled to derivative citizenship, the Court DENIES Petitioner's nationality claim.

## SO ORDERED

Dated: Brooklyn, New York
November 5, 2013

s/WFK

HON. WILLIAM F. KUNTZ, II
United States District Judge